IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LAMONT SHOLAR,

                    Plaintiff,

v.                                                                    OPINION and ORDER

DALE PAUL, ROBYN LODEN,                                    21-cv-183-jdp
and JUSTIN RIBAULT,

                    Defendants.

---

Pro se plaintiff Lamont Sholar suffers from plantar fasciitis and back pain. Sholar contends that staff at Columbia Correctional Institution violated the Eighth Amendment by denying him appropriate footwear and an appropriate mattress. Specifically, Sholar was allowed to proceed on claims: (1) against defendants Robyn Loden and Dale Paul for refusing to deliver shoes from an outside vendor even though an outside specialist and the prison's health services unit had granted him permission to order the shoes for treatment of his plantar fasciitis; and (2) against defendant Dr. Justin Ribault for deleting Sholar's restrictions for special-order shoes and a medical mattress from the medical database despite the podiatrists' orders and Sholar's need for those restrictions.[1]

Defendants move for summary judgment. Dkt. 38. I will grant the motion in favor of Loden and Ribault because no reasonable jury could conclude that either defendant consciously disregarded Sholar's foot or back condition. But a reasonable jury could conclude that

---

[1] Although the screening order refers to Ribault deleting the restrictions for "orthotics," I understand this to mean a restriction permitting Sholar to order shoes from an outside vendor to accommodate the orthotics. In any event, there is no evidence that Ribault deleted any medical restriction from the database.

defendant Dale Paul consciously disregarded Sholar's condition when he refused to deliver Sholar's medically allowed shoes without a valid security justification for doing so. Accordingly, the claim against Paul will proceed to trial.

## UNDISPUTED FACTS

I begin by addressing problems in both sides' summary judgment submissions. First, although Sholar opposes the motion, he did not respond to most of defendants' proposed findings of fact. And although he submitted a declaration asserting that there are "disputed facts" about what happened, he does not specify what facts are in dispute. Dkt. 46. Although he refers to exhibits "A,B,C, and D," no exhibits are attached to his declaration and there are no exhibits clearly marked in that fashion in the record. Accordingly, I will deem defendants' proposed facts to be undisputed, so long as those facts are material and supported by admissible evidence. *See* Prel. Pretrial Conf. Packet, Dkt. 27, at 15 ("If a party fails to respond to a fact proposed by the opposing party, the court will accept the opposing party's proposed fact as undisputed.")

As for defendants, their proposed facts are both over- and under-inclusive. Defendants proposed more than 50 facts covering the totality of the care that Ribault provided Sholar from July 2019 into March 2021. But as noted, Sholar was allowed to proceed against Ribault only on the limited claim that he "deleted plaintiff's restrictions for orthotic inserts and a medical mattress from the medical database" despite Sholar's continued need for the restrictions. Dkt. 21, at 7. Many of defendants' proposed facts are immaterial to these claims. Conversely, defendants overlooked entirely Sholar's claim that Ribault deleted the restriction permitting Sholar to order shoes from an outside vendor. Nevertheless, that claim is easily resolved by a

review of Sholar's records, which show that Sholar's restrictions remained in place during the relevant time.

The facts below are drawn from defendants' proposed findings and other evidence in the record.

**A. The parties**

Sholar is confined at Green Bay Correctional Institution, but the events in this lawsuit occurred when he was an inmate at Columbia Correctional Institution (CCI). All the defendants were employed at CCI at the relevant times: defendant Dale Paul was a correctional sergeant who supervised the mailroom and property department, defendant Robyn Loden was a lieutenant, and Justin Ribault was a physician.

**B. CCI's inmate shoe policy**

A Division of Adult Institutions policy governs what personal property inmates may possess at CCI. DAI Policy and Procedure 309.20.03, Attachments A and C. During the relevant time, inmates could purchase shoes from three approved vendor catalogs: Union Supply, JL Marcus, and Access. The Department of Corrections' property committee vets the items in the catalogs to ensure they meet department standards. Limiting shoes to those provided by these three approved vendors helps to foster security by reducing the likelihood that the products contain contraband, ensures that the items are durable, and reduces the likelihood of inmates or others engaging in potentially illegal activities.

The institution does not issue, purchase, or authorize shoes from non-approved vendors if the inmate is able to wear either state-issued boots or shoes that can be purchased from the approved-vendor catalogs. But the department recognizes that inmates sometimes need orthopedic or special shoes from a non-approved vendor for medical reasons. Such shoes must

be authorized by the Health Services Unit and must meet all specifications set forth in DAI Policy 309.20.03, which include the following:

- Athletic shoes shall be white, black, or gray
- Both shoes/boots must be identical color
- No spikes/cleats
- Maximum sole thickness 1¾ inch
- No removeable insoles
- No inside/concealed pockets or compartments
- No pump-up athletic shoes
- No removable straps
- Clear plastic windows/compartments must allow visual inspection
- No metal attachments, except metal lace eyelets or arch supports manufactured into sole (no speed laces, D-rings, cleats, logos or other ornamentation)

Further, Attachment C to the policy states that HSU-approved orthopedic/special shoes with colors other than white, black, or gray are prohibited.

## C.  June 2019 denial of Jordan shoes

Sholar has a history of plantar fasciitis and other foot problems for which he has been seen by medical providers both inside and outside the institution. On May 14, 2019, Sholar saw an outside podiatrist and was granted permission to purchase shoes from a non-approved vendor. As entered in the Wisconsin Integrated Computer System (WICS), the restriction stated that Sholar could "wear athletic shoes from alternative vendor as approved by Security" and noted that Sholar had heat molded insoles to wear.

Sometime after that appointment, Sholar or his family ordered a pair of Jordan Legacy shoes from Eastbay, which was not an approved vendor. The shoes arrived at CCI on June 17, 2019. When mail or packages for an inmate arrive at CCI, they go to the mail/property department (property department). The property department is responsible for monitoring, delivering, and disposing of inmates' property in accordance with DOC and institution policies

and procedures. At the relevant times, defendant Paul was responsible for overseeing the property department.

After inspecting Sholar's Jordan shoes from Eastbay, property department staff completed a Notice of Non-Delivery form notifying Sholar that the shoes had been received but were being held by property. A box was checked indicating the reason for non-delivery was because the "Item contains contraband." Sholar was to complete the Disposition section of the form to advise the department what it should do with the shoes.

On June 25, 2019, Sholar submitted an Interview/Information Request asking if his shoes were in the warehouse. Defendant Paul responded to Sholar's request. He told him that there were bubbles in the shoe heel and that he was going to set the shoes aside. He told Sholar to write to the Security Director to get a decision from him about the shoes.

On July 2, 2019, Sholar submitted another Interview/Information Request about his shoes. He said he didn't understand why they had been denied, noting that he had been allowed to have shoes with air bubbles in the heels in the past. He further stated that his podiatrist and orthopedic surgeon both recommended that he wear shoes with the air bubbles because they would help his foot issue.

Defendant Loden received and responded to Sholar's July 2 Request. Loden was involved in supervising the property department and mailroom. She was not involved in the initial daily review, delivery, or disposal of inmate property, but she often responded to requests filed by inmates seeking review of property decisions.[2] In responding to an inmate request,

---

[2] Sholar purports to dispute this fact, but he has not cited any contrary evidence. In any case, the dispute is immaterial.

Loden would look at the item, review the applicable policy, and inform the inmate of her decision.

Loden was not involved in making official institution complaint examiner (ICE) recommendations or decisions on inmate complaints that were filed within the Inmate Complaint Review System. But before responding to Sholar's July 2 Request, Loden emailed the ICE to ensure that her response would be consistent with what ICE would say in the event Sholar filed an inmate complaint about the shoe denial. Loden wrote: "Shoes are to be a solid color correct? Sholar ordered a pair from another vendor, because he is able to and they are black and then a portion are white with a grey like animal print." Loden Aff., Dkt. 42-2, Exh. 1009. The ICE, L. Alsum-O'Donovan, responded that the shoes did not need to be a solid color, but that Loden should deny Sholar his shoes because the institution's shoe policy did not specifically allow "prints." *Id*.

Loden told Sholar that the problem with the shoes was not the air bubble, but the fact that they had a print on them, which was not allowed. Sholar then tried to talk with Loden about the issue, but Loden told him that the discussion was over, that she had properly denied the shoes, and that he could pursue any further grievance through the Inmate Complaint Review System. Loden also told Sholar that he should purchase shoes that adhered to policy yet fit his needs.

Sometime after Loden responded, Sholar filed an inmate complaint with ICE about the shoe denial. ICE Alsum-O'Donovan contacted Loden and Security Director Gustke for consultation. The security director reviewed the shoes and agreed with Loden's denial decision. The security director noted that the shoes violated policy because they contained a pattern. In addition, the shoe had a red bottom and a removable insole, which were also not allowed.

Loden had no further involvement with Sholar's shoe issue.

**D. July 2019 denial of Nike shoes**

Meanwhile, Sholar ordered a pair of Nike Zoom Freak shoes from Eastbay, which were received at the institution on July 28, 2019. Dkt. 1-7, at 11. The property department issued a "Notice of Non-Delivery" to Sholar, again indicating that the shoes were being rejected as "contraband." The reason given this time was that Eastbay was "not an approved vendor." On August 7, Sholar submitted an Interview/Information Request, pointing out that he had merely ordered a different pair from Eastbay after his first pair had been denied, and no one had any issue with the vendor the first time. He also noted that he had medical permission to order shoes from a non-approved vendor and that he needed his orthotics custom-fitted to the shoe. Defendant Paul responded on August 8, asking: "Again, what is special about these shoes that are different from what you can get through [an approved vendor]?" Sholar responded the next day, stating that his doctors had recommended he be allowed to purchase athletic shoes from non-approved vendors because they offered more options for shoes with extra support and came in extra width sizes to accommodate his custom orthotics. Dkt. 41-6, at 5. On August 9, 2019, Paul responded, telling Sholar that the institution-approved vendors did, in fact, sell 4E shoes that could accommodate his orthotics.

**E. November 2020 denial of Jordan shoes**

On November 16, 2020, the property department received a pair of Jordan Max Aura shoes that Sholar had purchased from Eastbay. Once again, defendant Paul withheld the shoes because they had "air pockets" in the heel and he provided Sholar with a Notice of Non-Delivery. On November 24, 2020, Sholar completed the Notice's Disposition section and requested that property hold the shoes pending review by an ICE.

**F. Ribault's treatment of Sholar's foot pain**

Ribault began working as a physician at CCI on July 8, 2019, just after Sholar's first pair of shoes was denied. Ribault's first visit with Sholar was on July 18, 2019. Sholar complained of right leg neuropathy and bilateral plantar pains. At that time, Sholar expected his "outside orthotic shoes" to arrive in the near future. Ribault extended his orders for ice and "special shoe permission."[3] Ribault Dec., Dkt. 43, ¶ 6.

On August 8, 2019, HSU Nurse Denise Valerius emailed Ribault and asked what course of action he would like to take regarding Sholar's foot pain. The nurse reported that Sholar was stating that the foot pain was so bad that he was walking around on his tip toes. The nurse also stated that Sholar had received his new orthotics from Novacare on July 26 but he had not been able to use them because property was not releasing the shoes Sholar had ordered from Eastbay. Sholar was also asking for steroids to assist with the pain. The nurse stated that she had recently adjusted the wording on the restriction in the hopes that property would release the shoes. Sholar's WICS record indicates that on August 8, Nurse Valerius adjusted the wording on Sholar's shoe restriction to state: "Athletic shoes may be worn from alternative vendor per Podiatry recommendations." Dkt. 41-2, at 3.

Ribault reviewed Sholar's medical record and saw that he had seen Russell, the certified orthotist, on July 26, 2019. According to Russell's office visit note, Sholar's custom orthotics "fit OK but his shoes are too short and narrow." Dkt. 43-1. Ribault responded to the nurse that same day, August 8, 2019, and told her that he did not see any medical urgency to give

---

[3] I infer that Ribault meant "outside vendor" shoes, but this is not explicitly clear from the record.

Sholar steroid injections in his feet. As for his complaint about his shoes, Ribault wrote that it was a custody/property issue with institution security, not a medical issue.

On August 27, 2019, Nurse Valerius again modified Sholar's Medical Special Handling order, adding that the restriction authorizing him to wear athletic shoes from an alternative vendor was "per MD order 7/18/19." Dkt. 41-3.

Ribault saw Sholar again on September 13, 2019. Sholar told the doctor that he needed shoes from an outside vendor because the shoes from the institutional catalogs were not wide enough to accommodate his orthotics, noting that his outside providers recommended that he get a "triple E" wide shoe. On September 16, Ribault asked Michael Fink, a Corrections Unit Supervisor, if a triple E wide shoe was available in the approved catalog. Fink responded that there "should be several brands with that size available from the vendor catalogs." Dkt. 43-2, at 1.

About nine months later, on June 19, 2020, Ribault reviewed Sholar's chart after he failed to appear for an appointment. He noted that when he had seen Sholar for the first time in July 2019, he was in the "midst of receiving other footwear and his alternative vendor shoe restriction was requested to be extended." Dkt. 43-1, at 10. However, noted Ribault, "per my September note there was a misunderstanding of what shoes were available from the acceptable catalogues. In fact, his needs could be met from shoes from the available catalogues without the need of an outside vendor." *Id*. But there is no evidence that Ribault made any changes to Sholar's medical restrictions as documented in WICS.

About a week later, Ribault received a message from a nurse asking if he would renew Sholar's ice, pillow, and low bunk restrictions. The nurse also stated that the Health Services Unit was still working on getting Sholar's shoes from the property department, an issue that

9

had been ongoing for more than a year. (According to Sholar's verified amended complaint, the HSU emailed defendant Paul around that time and asked him to bring Sholar's shoes to the HSU, but Paul refused. Dkt. 18, par. 55. Paul does not address this allegation in his submissions.) Ribault asked the nurse to clarify why Sholar needed ice, an extra pillow, a low bunk, custom orthotics, or shoes "from property?" Ribault Aff., Dkt. 43, ¶ 20, Exh. 1010. The nurse responded that Sholar wanted the restrictions renewed before they expired, and that he was told he needed to wear his orthotics to help his back pain.

On July 2, 2020, Ribault wrote back to the nurse, stating that it was not clear to him why shoes from the approved vendors were insufficient and that he wanted an answer to that question. The nurse responded that Sholar had a restriction in WICS permitting him to order shoes from a non-approved vendor. Ribault responded that the WICS restrictions needed to be verified to determine if they were medically necessary.

On August 4, 2020, Ribault asked the nurse if she knew who had "allowed" Sholar to order shoes from an outside vendor; the nurse responded that it was a podiatrist. According to Ribault, it is common practice for patients seeing offsite providers to request approval for specialty items such as shoes from non-approved vendors. Ribault noted that in Sholar's case, the podiatrist had recommended "athletic shoe gear from alternative vendor." Ribault suspected that the podiatrist had made this recommendation at Sholar's request without reviewing the shoes offered in the approved vendor catalogs.

On August 5, Ribault sent a message to Dr. Ellen O'Brien, a DOC orthopedist, asking her if shoes from the available institution catalogs were appropriate for Sholar's medical needs. O'Brien indicated that she was not familiar with Sholar and she did not understand Ribault's note. Ribault then asked O'Brien to see Sholar next time she was at CCI.

O'Brien saw Sholar on August 17, 2020. Examining his feet, O'Brien recommended that he be fitted for a special kind of orthotics and receive physical therapy. This appears to have begun the process over again: on October 27, 2020, Sholar saw a podiatrist, Dr. Murphy, who recommended custom orthotics and "non-facility" high top athletic shoes in a "D" width. Ribault reviewed Murphy's recommendations on October 30, 2020.

On January 8, 2021, Sholar was again seen by Russell, the certified orthotist, at Novacare and again cast for custom orthotics. Sholar's medical records show that the orthotics were received in the HSU on June 1, 2021. Dkt. 43-1, at 49. By then, Sholar's care had been transferred from Ribault to APNP Kristine Lyon, ending Ribault's involvement in Sholar's care.

**G. Sholar's documented restrictions**

In connection with this lawsuit, Ribault reviewed Sholar's WICS restrictions and could find nothing showing that an order for a medical mattress had ever been placed during the doctor's time at CCI. But there was a record showing that the medical mattress had been changed to a flat mattress on June 3, 2018, before Ribault started working at CCI. On June 2, 2021, a "Special Needs Committee" denied Sholar's request for a medical mattress, but Ribault was not on that committee.

Sholar's record reflects that the medical order permitting him to wear athletic shoes from an outside vendor was never deleted and did not expire while Sholar was under Ribault's care. Dkt. 41-3 (showing restriction was to end on July 20, 2021); Dkt. 41-2, at 3 (showing order was extended through August 2022 on July 3, 2021 by Dr. Steffanides).

ANALYSIS

The Eighth Amendment prohibits prison officials from consciously disregarding a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). In cases in which defendants "are not part of the medical staff, deliberate indifference can be shown with evidence that those employees ignored or interfered with a course of treatment prescribed by a physician." *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016) (citing *Estelle*, 429 U.S. at 104–05).

For purposes of summary judgment, defendants do not dispute that Sholar's documented feet and back problems are objectively serious medical conditions. They also do not dispute that they were aware of the conditions and of his medical restriction permitting

him to order athletic shoes from a non-approved vendor. But the nonmedical defendants, Loden and Paul, say they justifiably withheld Sholar's shoes for security reasons. And Ribault denies ever deleting a medical mattress restriction from the database. (As noted, he does not specifically say whether he deleted the shoe restriction, but he generally argues that the care he provided to Sholar for his foot and back pain was reasonable and appropriate.) I address each defendant in turn.

**A. Loden**

Sholar cannot succeed on his claim that Loden consciously disregarded a serious medical need by failing to provide him with the Jordan Legacy shoes that were received in the property department in June 2019. It is undisputed that even if an inmate has permission to order shoes from an outside vendor, the shoes must meet institutional requirements. As set out above, Loden determined, after consulting with the ICE, that Sholar's shoes failed to comply with the institution's specifications because they bore a print pattern. Her decision to deny the shoes was later affirmed by the ICE, in consultation with the institution's security director. Sholar suggests in his brief that Loden could not use the policy to "overrule" his medical restriction and "delay" meaningful treatment, but he fails to adduce evidence showing that Loden did not reasonably believe that (a) the Jordan shoes violated institutional specifications, and (b) there were other shoes available to Sholar that would comply. And even if Loden was wrong about what the specifications allowed, the violation of a prison policy does not, by itself, establish a constitutional violation. *See Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688, 690 (7th Cir. 2005). Finally, Loden's refusal to continue to discuss the shoe issue with Sholar after she had already looked at the shoes and made her determination was not unreasonable, given that Sholar could appeal her decision to the ICE. On these facts, no reasonable jury could

conclude that Loden's decision to deny the Jordan Legacy shoes reflects a conscious disregard of a medical need.

## B. Paul

Like Loden, defendant Paul argues that he properly denied Sholar his Jordan shoes because they were in violation of the institution's property policy. But Paul stands on weaker ground than Loden, for two reasons. First, although defendants argue broadly and repeatedly that Sholar's shoes violated "institution policy," they ignore the fact that the specific reason cited by Paul for denying the shoes — the "air bubble" in the heel— is *not* prohibited, as attested to by co-defendant Loden and affirmed by the ICE who reviewed Sholar's initial complaint about the shoe denial. This does not make much difference as far as the June 2019 denial goes, given that the security director determined that Sholar's shoes were prohibited for other reasons. But it does undermine the legitimacy of defendants' argument that "institution policy" and not any action or inaction on Paul's part prevented Sholar from receiving the *second* pair of Jordans in November 2020. A jury could reasonably infer that Paul would have known from the first go-round with the Jordans in 2019 that air bubbles in the heels were not a problem, which suggests that his purported concern about the air bubbles was simply a manufactured excuse for denying Sholar's shoes in November 2020.

Second, and more important, defendants' briefs address only the decisions to reject the Jordan shoes. Defendants conspicuously avoid any discussion of the denial of the Nike shoes. These shoes were denied *not* for security reasons but because they were not from an approved vendor. But as defendants admit in their briefing, Sholar's medical exception expressly *allowed* him to order shoes from outside vendors. Defendant Paul essentially overrode that order in

14

denying Sholar the shoes, and he did not offer any security reason for doing so at the time or in his summary judgment submissions.

Defendants suggest that their failure to give valid security reasons doesn't matter, because no specialist ever said that the specific shoes Sholar ordered were medically necessary. In support, they rely on this court's decision in *Edwards v. Waterman*, No. 16-cv-265, 2019 WL 233512, at *6 (W.D. Wis. Jan. 16, 2019). In that case, this court rejected Edwards' argument that a special needs committee had no authority to reject his podiatrist's recommendation that the plaintiff should be allowed to order Nike Air Max shoes. *Id*. But in *Edwards*, the defendants had reviewed the podiatrist's orders to determine what in particular he was recommending, concluding from his notes that he was recommending only that the plaintiff should be allowed to order shoes that could properly accommodate his orthotics, not a specific brand of shoes. This court found defendants' conclusion to be reasonably supported by the doctor's orders. *Id*. And there was more: the podiatrist submitted a declaration confirming that he never intended to prescribe Edwards a specific brand of shoe and that any athletic-style shoe would be sufficient to accommodate his orthotics. *Id*.

This case is different. The special needs committee in *Edwards* was specifically charged with deciding whether the specific recommendations by the outside podiatrist were medically necessary, and a nurse was on the committee. Here, by contrast, defendant Paul is a nonmedical member of the prison staff, and there is no evidence in the record that he ever consulted a medical professional about the necessity of the "outside vendor" restriction before overruling it and denying Sholar his shoes. What is more, the record suggests that Paul continued to withhold the shoes even though medical staff was asking for their release so that Sholar could use his orthotic inserts in them. "Interference with prescribed treatment is a well-recognized

15

example of how nonmedical prison personnel can display deliberate indifference to inmates' medical conditions." *McDonald*, 821 F.3d at 890 (citing *Estelle*, 429 U.S. at 104–05).

In his affidavit, Paul says he was "aware that Sholar had a medical restriction for the type of shoe he should be wearing," but "CCI's approved vendors appeared to have shoes that fit this restriction/recommendation." Dkt. 41, at 9. He may very well have been right, but that was not his call to make. Certainly, defendants don't make that argument in their brief: as noted, they *admit* that Sholar "could order shoes from non-approved vendors." Dkt. 39, at 2. What they don't say is why it was permissible for Paul to override that order. This being so, a reasonable jury could conclude that Paul consciously disregarded Sholar's serious medical needs when he persisted in withholding the Nike shoes from a non-approved vendor without a valid security reason for doing so, particularly when he appears to have done that again with respect to the Jordans in November 2020. So I will deny the motion for summary judgment as to Paul.

**C. Ribault**

Sholar's claims that Ribault deleted his medical restrictions have no support in the record. As set out above, there was no medical mattress restriction in place at any time that Ribault treated Sholar and Ribault denies deleting one. Sholar has presented no evidence to the contrary. (His unsupported assertion in his brief is not evidence.) As for the restriction permitting Sholar to order shoes from a non-approved vendor, Sholar alleged in his amended complaint that Ribault "must have" deleted this restriction because the restriction was removed and only a doctor could do so. Dkt. 18, at 14. But Sholar's records show that restrictions permitting him to order shoes from an outside vendor remained in place. So far as it appears, Sholar was mistaken about Ribault deleting his documented medical restrictions.

16

In his brief, Sholar argues that Ribault nevertheless consciously disregarded Sholar's foot pain because the doctor was aware that the nonmedical staff in the property department were disregarding the medical restriction from the podiatrist allowing Sholar to order shoes from an outside vendor. However, the record reflects that Ribault did not simply ignore Sholar's property issue. To the contrary, he specifically asked Sholar why outside shoes were recommended and, after Sholar told him he needed triple E shoes, the doctor emailed a security officer to find out whether such shoes were available in the approved vendor catalogs. He was told they were. Then, when the issue resurfaced in June 2020, Ribault sought to find out who issued the "non-approved vendor" restriction and the reasons behind it; when he hit a dead-end, he asked Dr. O'Brien, the orthopedist, to see Sholar.

Under these circumstances, Sholar cannot show that Ribault consciously disregarded an excessive risk to his health. Sholar is correct that, under some circumstances, a "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Wilson v.* Adams, 901 F.3d 816, 822 (7th Cir. 2018) (citation omitted). But this does not mean that a prison doctor must "always" follow a recommendation from a specialist, and in any case, Ribault did not "ignore" the instructions. To the contrary, he sought to understand their source and the rationale behind them, inquired of Sholar about his need for the restriction, and had Sholar evaluated by an orthopedist, presumably to determine whether the restrictions were in fact medically necessary. While Sholar may disagree with these actions, they were not unreasonable, and do not permit an inference of deliberate indifference to Sholar's foot pain. Accordingly, his claims against Ribault will be dismissed.

To help Sholar prepare for trial, I will shortly issue a separate trial preparation order that provides detailed information about how trial works and how Sholar should prepare.

17

Sholar should review the trial preparation order carefully and notify defendants' counsel or the court if he has specific questions about preparing for trial.

ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED in part and DENIED in part. The motion is GRANTED as to defendants Robyn Loden and Justin Ribault. It is DENIED as to defendant Dale Paul.

Entered December 12, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge